## Wytheville.

## ARBUCKLE BROS. V. GATES & BROWN.

JUNE 9, 1898.

Absent, Cardwell, J.

1. CONSIGNOR AND CONSIGNEE—*Seller and Buyer—How Written Instruments Construed.*—Where goods are consigned to a factor for sale, they remain the property of the consignor till sold, and are not liable for the debts of the consignee. But whether the agreement between the parties constitutes the relation of consignor and consignee, or that of seller and buyer is to be determined by the facts of the particular case. The agreement cannot make a sale of personal property, and at the same time constitute the buyer simply an agent of the seller to hold the property until it is paid for. The legal character and effect of the agreement between the parties. is to be determined from a consideration of all its provisions taken together, and not from the mere name given to it by the parties thereto, or from isolated provisions thereof.

2. SALE OF GOODS—*What Constitutes—Principal and Factor.*—A person who agrees to pay a fixed price for goods at a fixed time, without regard to the price or terms at or upon which he may sell them to others, and irrespective of the fact whether he shall sell them to others or not, or shall collect the proceeds or not, and who guarantees the sale of each consignment of goods within a given period, is a purchaser of the goods and not a mere factor, though the contract contain other provisions consistent with the relation of principal and factor, and be designated by the parties as a "Special Selling Factor Appointment."

3. RESERVATION OF TITLE TO PERSONAL PROPERTY—*Void as to Creditors and Purchasers Unless Recorded—Trustee a Purchaser—Notice—How Proved—Burden of Proof.*—Although the title to goods be reserved in a written contract for the sale thereof, the reservation, under section 2462 of the Code, is void as to creditors and purchasers for value and without notice until and except from the time such contract is duly admitted to record; and a trustee in a deed of trust to secure creditors is a purchaser for value within the meaning of that

section. If it be alleged that the trustee is a purchaser with notice, the burden of proof to show notice is on the party alleging it. The fact of notice, however, may be inferred from circumstances as well as shown by direct evidence, but the proof must be such as to affect the conscience of the purchaser, and must be so strong and clear as to fix upon him the imputation of bad faith.

Argued at Richmond. Decided at Wytheville.

Appeal from a decree of the Chancery Court of the city of Richmond, pronounced March 8, 1897, in the chancery suit of *Kingan & Co.* v. *Boudar, trustee, and others*, in which appellants filed their petition, to which petition the appellees, Gates & Brown, and Boudar, trustee, were made defendants.

*Affirmed.*

The principal suit was brought for the purpose of having administered under the direction of the court the trust created by a deed from Gates & Brown to Boudar, trustee. The appellants claimed that Gates & Brown were their factors for the sale of coffee, and that at the time Gates & Brown made their deed to Boudar, trustee, there was certain coffee on hand, of which the trustee had taken possession, and accounts due for coffee sold, all of which was the property of appellants and not of Gates & Brown, and they filed their petition setting up their claim and asking to have the coffee on hand or its proceeds delivered to them, and also the amounts collected by the trustee for coffee sold to other parties. The Chancery Court, being of opinion that Gates & Brown were purchasers of the coffee and not mere factors of the appellants, dismissed their petition, and they appealed.

*Wyndham R. Meredith*, for the appellants.

*Christian & Christian* and *Leake & Carter*, for the appellees.

RIELY, J. delivered the opinion of the court.

The correct determination of this case depends mainly upon the construction that must be given to the agreement in writing of February 1, 1895, between Arbuckle Brothers and Gates & Brown. Did it create a mere agency in Gates & Brown for the sale of their coffee, or did it constitute a sale of the coffee to them? The solution of this question is to be arrived at from a close scrutiny of all the provisions of the agreement, and the consideration of them as a whole.

The agreement purports, on its face, to be a "Special Selling Factor Appointment," and to constitute Gates & Brown the factors of Arbuckle Brothers.

It starts out by declaring that all goods consigned by Arbuckle Brothers to Gates & Brown on their requisition shall, until sold in regular course of business, remain the property of Arbuckle Brothers, with the title in them, and be merely held by Gates & Brown as their factors; and that they shall never purchase the goods for their own account.

It is next stipulated that Gates & Brown shall sell and bill the goods in their own name, but only at such prices and on such terms as Arbuckle Brothers may give them from time to time.

Then follows a number of stipulations that are irreconcilable with the relation of a factorship, or an agency between the parties.

Gates & Brown are required not only to assume all risk as to the credit of the persons to whom they may sell the goods, and to make all collections at their own expense, but they are to guarantee the sale of each "consignment" and the payment therefor within sixty days from its date. They are required to remit the full amount of each "consignment," less a paltry sum designated as commissions, by the end of sixty days, whether the whole "consignment" shall have been sold or not, and whether the proceeds of sale shall have been collected or not. They are

further required to insure Arbuckle Brothers against decline in the price of unsold goods, and shall be entitled to the benefit of any advance in the price of them.

No provision whatever is made for the return of any goods that may not be sold, nor for the reclamation of any moneys paid by Gates & Brown for the coffee. No account of their sales is required to be rendered. to Arbuckle Brothers, and they acquire no information as to the persons to whom Gates & Brown may sell the goods; but Gates & Brown become primarily the absolute debtors of Arbuckle Brothers for the goods, whether they ever dispose of them or not. They are required to pay for them at the price fixed at the date of each "consignment," and at a fixed time, whether they have then sold them or not, or whether they have collected the proceeds of sale or not.

It is very plain that this was not an ordinary transaction between a consignor and a consignee. Where goods are consigned to a factor for sale, they remain until sold the property of the consignor and are not subject to the debts of the factor, and no ingenious contract, such as that under consideration, is required to protect them from his creditors. The agreement was an attempt to accomplish that which cannot be done: To make a sale of personal property ·and at the same time constitute the buyer simply an agent of the seller to hold the property until it is paid for. The two things are incompatible and cannot co-exist. The agreement had in it every element of sale. It was in substance and effect a sale, and must be so declared. It does not matter by what name the parties chose to designate it. That does not determine its character. The courts look beyond mere names and within to see the real nature of an agreement, and determine from all its provisions taken together, and not from the name that has been given to it by the parties or from some isolated provision, its legal character and effect.

In *Heryford* v. *Davis,* 102 U.S. 235, the agreement purported to be a loan of cars for hire, but the court held that it was a contract of sale. Said Mr. Justice Strong, in delivering the

opinion of the court: "What, then, is the true construction of the contract? The answer to this question is not to be found in any name which the parties may have given to the instrument, and not alone in any particular provision it contains, disconnected from all others, but in the ruling intention of the parties, gathered from all the language they have used. It is the legal effect of the whole which is to be sought for. The form of the instrument is of little account." See also *Harvey* v. *R. I. Locomotive Works*, 93 U. S. 664; and *Sturm* v. *Boker*, 150 U. S. 312.

In Tiedeman on Sales, sec. 8, it is said: "Whenever the result of the transaction is that the transferee is the primary debtor, even where the title to the goods does not pass out of the consignor until the sale, the sale of the goods by the consignee will necessitate a previous transfer to the consignee, and the consignment is thus changed into a sale."

In *ex parte White*, 6 Chancery Appeal Cases, 402, Sir George Mellish, Lord Justice, said: "But if the consignee is at liberty, according to the contract between him and his consignor, to sell at any price he likes, and receive payment at any time he likes, but is to be bound, if he sells the goods, to pay the consignor for them at a fixed price and at a fixed time—in my opinion, whatever the parties may think, their relation is not that of principal and agent. The contract of sale which the alleged agent makes with his purchasers is not a contract made on account of his principal, for he is to pay a price which may be different, and at a time which may be different from those fixed by the contract. He is not guaranteeing the performance, by the persons to whom he sells of their contract with him, which is the proper business of a *del credere* agent; but he is to undertake to pay a certain fixed price for those goods at a certain fixed time, to his principal, wholly independent of what the contract may be which he makes with the persons to whom he sells; and my opinion is that, in point of law, the alleged agent in such a case is making, on his own account, a contract of purchase with his alleged principal, and is again selling."

In the case at bar Gates & Brown, as we have seen, were to pay Arbuckle Brothers a fixed price for the goods and at a fixed time, without regard to the price or terms at or upon which they might sell them to other persons, and irrespective of the fact whether they had sold them at all or not, or had collected the proceeds of sale or not. Prohibition against selling below the trade price, or reserving the right to fix, from time to time, the price at which the buyer shall sell the goods, is a very common device to prevent competition and maintain prices. It has, however, but little tendency to prove an agency, and cannot control or neutralize the distinct elements of a sale, contained in other provisions of the agreement.

In *Williams* v. *Drummond Tobacco Company*, 44 S. W. Rep. 185, an agreement, which was very similar in its essential features and provisions to that under consideration, was construed by the Court of Civil Appeals of Texas. The agreement purported that the Drummond Tobacco Company appointed A. H. Schluter & Co. agents to sell its tobacco at such prices as the company should from time to time prescribe, and that the title to the tobacco should remain in the tobacco company until sold by the said agents. The latter were to receive a commission for selling, and, in consideration thereof, warranted that every shipment made to them should be paid in full. The company, in shipping the tobacco, invoiced it to A. H. Schluter & Co. as agents, and used a bill-head that designated the shipment as a "consignment." It was shown that after the shipment of each bill of tobacco, the company would draw an acceptance of the same date as the invoice of the tobacco for the amount of the bill, less the commission, payable sixty days after date, which Schluter & Co. would accept, and the company, at the maturity thereof, would present for payment, and Schulter & Co. would pay, whether they had sold the tobacco or not. The court decided that the transaction was a sale, and did not create an agency.

In *Mack* v. *Drummond Tobacco Company*, 67 N. W. Rep.

174, a contract, similar in its terms to the one construed in the above cited case from the Texas court, was held by the Supreme Court of Nebraska to be a sale, and not an agency.

An instrument identical in every respect with the one under discussion was before the Supreme Court of Tennessee for construction in the case of *Arbuckle Brothers* v. *Kirkpatrick,* 98 Tenn. 221, where the court, in an elaborate opinion, and after a review of the authorities, decided that the agreement between the parties amounted, in legal effect, to a sale. "The contract," said the court, in concluding its opinion, "is certainly a remarkable one, partaking in many of its provisions of a contract of agency, and in many others of a sale. It is evidently intended as either or both, as might suit the convenience or serve the purposes of the complainants.   *   *   *   *   *   *   In construing such a contract, whenever it affects the rights of others, it will be so construed as to protect such rights, and not to enable the complainants to carry out any double purpose."

Similar contracts were construed in the following cases to constitute a sale and not an agency: *In re Linforth,* 4 Sawyer 370; *Chickering* v. *Bastress,* 130 Ill. 206; *Aetna Powder Co.* v. *Hildebrand,* 137 Ind. 462; *Aspinwall Manf'g Co.* v. *Johnson,* 97 Mich. 531; *Braunn* v. *Keally,* 146 Pa. St. 519; and *Kellam & Moore* v. *Brown,* 112 N. C. 451.

A number of cases were cited to us by the learned counsel for the appellants to sustain his contention that the agreement in question created a mere agency, and not a sale. An examination of them discloses that the provisions of the contracts construed in those cases were materially different from the provisions of the one we have been considering. It must suffice to refer to a few of those mainly relied upon and deemed most apposite.

In *Burton* v. *Goodspeed,* 69 Ill. 237, Burton agreed to furnish Holbrook with coal on board of vessel at his dock, and the latter agreed to hoist it from the vessel, put in on the dock, and pay the lake freight, charging the cost of hoisting and put-

ting the coal on the dock and the freight against the coal, and to receive for docking, screening, selling, and delivering the coal, including his commissions, the sum of $1.50 per ton on all coal delivered at any point outside of the yard requiring carting, and $1.00 per ton for all delivered on the yard, with an additional 50 *per cent.* of the net profits of sale. Holbrook agreed to guarantee the payment of all sales, to advance to Burton $3.00 per ton on the coal as it was shipped, and to pay over the balance of the proceeds of sale as the coal was sold. He also agreed to keep correct accounts, render monthly statements, and not to sell below the market price.

Holbrook was thus required to keep regular accounts of his transactions with respect to the coal as any factor or commission merchant would be obliged to do, and to render to Burton monthly statements, showing the amount of the coal sold and the prices obtained. He did not have to pay for any coal until he had sold it, and only guaranteed such sales as he might make. It is evident that this was an ordinary consignment contract, and the court so held.

In *Conable* v. *Lynch*, 45 Iowa 84, Berry agreed to sell machines for Conable to such persons only as were perfectly responsible, take notes for the deferred payments, endorse them, and guarantee their payment. He was to send to Conable the notes of purchasers as he sold the machines, and to remit promptly the proceeds of all cash sales, less the amount of his commissions. All the machines, until paid for, were to remain the property of Conable, and at the expiration of the contract, Berry was to pay for all machines not sold. The court held that the effect of the contract was to make Berry the agent of Conable until the termination of the contract, but after that time it was a conditional sale.

It thus appears that, until the expiration of the contract, the relation of creditor and debtor did not arise. Until then Berry sold the machines for and on account of Conable, and the relation between them was that of principal and agent, but when

the contract expired by limitation and Berry came under the obligation to pay for all unsold machines, the court held that the contract made the transaction a conditional sale.

In *Bayliss* v. *Davis*, 47 Iowa 340, Bayliss, under the agreement there construed, appointed one Stinson his agent to sell harvesters, and agreed to allow him a commission of $40 on each harvester. Stinson agreed to advance one-third of the price and give his notes for the residue, and to sell on the same terms. All notes taken for machines sold by him were to be made payable to Bayliss, the proceeds of sales were to be remitted by him to Bayliss as fast as received, after deducting his advances, and his own notes were to be taken up by exchanging for them the notes of farmers to whom he had sold machines. It was said by the court that while the advance of money and giving notes would ordinarily, without explanation, indicate a sale, yet when considered in connection with the fact that Berry was to be repaid his advances from the cash payments made by farmers to whom he sold machines, and that his own notes were to be taken up and paid by their notes, it was not inconsistent with the agency which was set out in other parts of the contract.

Those peculiar provisions which determine the nature of the agreement between Arbuckle Brothers and Gates & Brown are absent from the contract construed in the above case. As in the previous case, the harvesters were to be sold for and on account of Bayliss; the notes of purchasers were to be made payable to him, and the proceeds of sales remitted to him, and the contract imposed no obligation on Stinson to pay for the machines at a fixed time, whether he had sold them or not, or whether he had collected the proceeds of sale or not, without any provision for reclamation, as required by the terms of the agreement before us.

The case of *Thompson & Co.* v. *Barnum & Co.*, 49 Iowa 392, is very similar in its general features to the two preceding cases. The goods were to be paid for in farmers' notes, and to be endorsed and their payment guaranteed by the agents. All notes

for sales made by the agents were to be taken payable to the principals, and reports and remittances to be made to them by the agents on the first of each month.

In *Norton & Co.* v. *Mellick*, 66 N. W. R. 780, which was also an Iowa case, the agreement was that Norton & Co. should furnish certain brands of flour at specified prices to Mellick, to be sold by him as their agent, and he agreed to sell the same at not less than given prices, to render account of sales every thirty days, and to remit with report the proceeds of sales. He also agreed to buy at end of ninety days, at prices at which it was invoiced, any flour that had not been sold, and that the title, ownership, and right of possession of the flour should remain in Norton & Co. until paid for in full. The flour having been destroyed by fire within the ninety days, Norton & Co. sued Mellick for its value. The court decided that the contract was one of agency, and that Mellick was not liable. This would seem to be very clearly so. The relation of sellor and buyer, of creditor and debtor, would not arise until the expiration of the ninety days, when Mellick came under an obligation to buy any flour that then remained unsold. Until then, the relation was simply that of principal and agent. Until then, Mellick was to sell the flour for Norton & Co. at prices given by them, render to them monthly accounts of sales, and remit the money for all flour sold.

In *Metropolitan National Bank* v. *Benedict & Co.*, 74 Fed. Rep. 182, the Stern Auction & Commission Company agreed with Benedict & Co., who were manufacturers of clothing, to sell consignments of clothing at prices given, without any charges of commissions, freight, or other charges, and that no part of the consignment should remain unsold or not paid for by a specified date. It was held that the contract was not a sale, but a contract of factorage. There was no provision binding the commission company to pay for the clothing as purchasers, but only to account for the proceeds of sale at prices fixed by the contract. There was no agreement by it to pay for the clothing at a stip-

ulated time, but only a covenant that no part of the consign-
ment should remain unsold or be unpaid for by a fixed time,
for whose breach Benedict & Co. might recover any damages
they had sustained.

It is unnecessary to proceed further to distinguish the cases
cited by counsel for the appellants from the case at bar. Those
to which we have not referred are still less apposite than those
which we have reviewed. The contracts construed in them were
even more dissimilar in their provisions and were materially
different in substance from the agreement out of which this
controversy has arisen.

Conceding for the purposes of this case that, although the
agreement constituted a sale and not an agency, there was a valid
reservation by Arbuckle Brothers of the title to the coffee until
the same was paid for, it was still necessary that the agreement be
duly docketed according to the provisions of sec. 2462 of the
Code as amended, or such reservation was void as to creditors
and purchasers for value without notice.

A trustee in a deed of trust to secure creditors is, under many
decisions of this court, a purchaser for value. *Chapman* v.
*Chapman*, 91 Va. 400, and the cases there cited. It was, how-
ever, earnestly contended by the counsel for the appellants that
H. C. Boudar, the trustee in the assignment of Gates & Brown,
was a purchaser—not without but with notice. The burden
was on the appellants to prove notice. The only evidence re-
lied on to establish it was the testimony of Boudar himself,
which was taken by the appellants themselves. He testified
that he was the book-keeper of Gates & Brown; that he received
the invoices of the goods after they had been examined and ap-
proved by Mr. Brown; and that it was his duty to remit the
amount called for by the invoices at the maturity of the bills,
less rebates and discounts. He further testified that no notice
was given to him, either before or at the time of the assignment;
that the coffee was the property of Arbuckle Brothers and not
the property of Gates & Brown. He also testified, when inter-

rogated as to the agreement in question, that he had seen such a paper, and though unable to say when, he thought it was *after* the assignment; that he knew he had seen it since the assignment, but was in doubt whether he had seen it before.   He did not need to know its conditions in order to perform the duties of his position, and was without any interest to make inquiry obligatory.

It also appeared in evidence that Gates & Brown did a wholesale grocery business in the city of Richmond; that they treated the coffee just as they did all their other goods; that they sold it to their customers in the usual course of business and charged it to such purchasers in their general accounts along with other groceries of every character and description; and that no separate account was kept of the sales of the coffee to distinguish them from the sales of any other goods sold by them.

It was held by this court in *Vest* v. *Michie*, 31 Gratt. 149, that while the fact of notice may be inferred from circumstances as well as proved by direct evidence, yet the proof must be such as to affect the conscience of the purchaser and must be so strong and clear as to fix upon him the imputation of *mala fides*.  See also *Johnson* v. *National Exchange Bank*, 33 Gratt. 473; and *Morrison* v. *Bausemer & Co.*, 32 Gratt. 225.   The evidence in this case cannot be said to go to that extent.   There is no proof that Boudar had ever seen the agreement between Arbuckle Brothers and Gates & Brown or knew of its conditions until after their assignment to him, when he received notice some days thereafter that Arbuckle Brothers claimed the coffee.

An effort was made by the appellants to prove by him that even if he had never seen the agreement until after the assignment and was without knowledge of its provisions, yet that the conditions of the agreement were printed at the foot of the invoices, and that he was thereby affected with notice of them, but his testimony was that this printed matter—to the best of his knowledge and belief—was torn off all the invoices before they were turned over to him for entry, and there was no evidence that his statement was untrue.

We are of opinion that the evidence falls short of that clearness that would affect the conscience of Boudar, trustee, and fix upon him the imputation of *mala fides,* and that he must be held to be a purchaser for value without notice.

The decree of the Chancery Court must be affirmed.

*Affirmed.*